IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 6, 2017 Session

## STATE OF TENNESSEE v. RAY ARMSTRONG

**Appeal from the Criminal Court for Shelby County**
No. 15-02553      Lee V. Coffee, Judge

_____

### No. W2016-01996-CCA-R3-CD
_____

A Shelby County Criminal Court Jury convicted the Appellant, Ray Armstrong, of four counts of possessing one-half gram or more of cocaine with intent to sell or deliver within a drug-free school zone, one count of destroying evidence, and one count of resisting arrest. The trial court merged the convictions of possessing cocaine, and the Appellant received an effective sentence of fifty and one-half years in confinement. On appeal, he contends that the evidence is insufficient to support the convictions, that the trial court erred by denying his motion to suppress evidence, that the trial court erred by allowing a witness to give testimony that was hearsay and violated Tennessee Rule of Evidence 404(b), that the trial court erred by refusing to instruct the jury on criminal attempt as a lesser-included offense of destroying evidence, that the State improperly mentioned a missing witness during closing argument, and that his four convictions and sentences for possessing cocaine violate double jeopardy. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Harry E. Sayle, III (on appeal) and Thomas Paul Pera, Jr., and Katherine Oberembt (at trial), Memphis, Tennessee, for the appellant, Ray Armstrong.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In May 2015, the Shelby County Grand Jury indicted the Appellant for count one, possession of one-half gram or more of cocaine with intent to sell within 1,000 feet of a private school, a Class A felony; count two, possession of one-half gram or more of cocaine with intent to deliver within 1,000 feet of a private school, a Class A felony; count three, possession of one-half gram or more of cocaine with intent to sell within 1,000 feet of a daycare, a Class B felony; count four, possession of one-half gram or more of cocaine with intent to deliver within 1,000 feet of a daycare, a Class B felony; count five, destroying evidence, a Class C felony; and count six, resisting arrest, a Class A misdemeanor. The indictment alleged that all of the offenses occurred on June 13, 2014.

At trial, Benjamin Daugherty testified that in June 2014, he was an officer with the Memphis Police Department (MPD) and worked in a "high crime" area of the city where "we have a lot of drug problems, aggravated assaults, car robberies, and car break-ins." On the afternoon of June 13, Officer Daugherty and his partner, Officer Brandon Cockman, were riding bicycles "just to patrol that area and be visible, try to keep crime down through presence." He described their clothing as "bright yellow, high visibility, name, badge, police on it and everything" and acknowledged that they were armed.

Officer Daugherty testified that when he got into the middle of the intersection at Fourth and Vance, he saw the Appellant on the southwest corner "making what appeared to be a hand-to-hand drug transaction" with two males. Officer Daugherty saw the Appellant receive money from one of the males and hand "something" to the male. However, Officer Daugherty could not identify the item. He stated that he did not know the two males but that he knew the Appellant because he used to come into contact with the Appellant "at least once a week." He said that the Appellant had "advised me before that he sells drugs, but that I would never catch him."

Officer Daugherty testified that he and Officer Cockman approached the Appellant and the two males and that "[t]hey immediately turned away from us as if they were trying to hide something." Officer Daugherty then testified,

> I asked the individuals, you know, "What's going on?" Just tried to have a casual conversation. Asked them if they were exchanging drugs or anything. They advised, "No." I asked them if they minded if I patted them down for any weapons, because weapons are usually in the same area as drugs. [The two males agreed.] So we continued to do a frisk of the two individuals, me on one, and my partner, Cockman, on the other.

- 2 -

Officer Daugherty said that the Appellant was wearing clean clothes, that the Appellant's body was clean, and that he did not see anything to indicate the Appellant was a drug user. The two males, though, were wearing dirty clothes, smelled like they had not had a bath in days, and had long fingernails and "maybe some scruffy beard."

Officer Daugherty testified that while he was frisking one of the males, he continued talking to the Appellant. The Appellant was "trying not to talk much" and "just mumbling" and then refused to answer the officers' questions. Officer Daugherty said that he noticed plastic baggies containing crack cocaine in the Appellant's mouth, that he knew the substance in the baggies was cocaine "through experience," and that he told the Appellant to spit out the baggies. At that point, the Appellant "began chewing and trying to swallow" and tried to get away from the officers. Officer Daugherty grabbed the Appellant and struggled with him. Officer Daugherty said that the Appellant "[k]icked at us and swung at us with his fists" and that he had to resort to "hard techniques" by hitting the Appellant with his fist. During the altercation, the Appellant spit out two baggies and told the officers that he "had swallowed." The Appellant stopped resisting, and Officer Daugherty handcuffed him. Officer Daugherty called for an ambulance due to his use of force on the Appellant and because Officer Daugherty had received some scrapes and bruises during the struggle. The Appellant refused medical treatment, and the officers put him into the back of a patrol car.

Officer Daugherty testified that he found two small plastic bags on the ground and that the bags were wet with the Appellant's saliva. The first bag was "torn open or chewed open with just [residue] in it, . . . no actual rocks." The second bag contained crack cocaine, a white rock-like substance. Officer Daugherty said that he thought the Appellant may have swallowed some of the cocaine from the open bag and that he did not know exactly how much cocaine the Appellant swallowed. Therefore, a police officer transported the Appellant to a hospital. Officer Daugherty collected the two plastic bags and gave them to Officer Darrell Cherry.

On cross-examination, Officer Daugherty testified that he was armed with a forty-caliber Sig Saur handgun, pepper spray, and an expandable baton at the time of the Appellant's arrest. He acknowledged that he had "stopped and checked" the Appellant many times previously but denied searching the Appellant on prior occasions, stating, "We wouldn't search him, but we'd pat him down, yes. You don't search somebody unless you have probable cause." Officer Daugherty had never arrested the Appellant for selling drugs prior to June 13 but had "observed Mr. Armstrong make what appeared to be hand-to-hand transactions with other individuals, and we have arrested other individuals on the scene in possession of drugs." Officer Daugherty said that he had never seen the Appellant hand drugs to other people previously and that he did not

- 3 -

remember when the Appellant told him that the Appellant "sells drugs." The Appellant driver's license was suspended, and Officers Daugherty and Cockman cited him one time for driving on a suspended license. However, Officer Daugherty did not remember citing or arresting the Appellant for any other crime prior to June 13.

Officer Daugherty testified that he did not see what the Appellant did with the money the Appellant received on June 13 because the Appellant turned his back to the officers. Officer Daugherty acknowledged that he "detained" and patted-down the two males who were with the Appellant. He did not obtain their names, though, and they left the scene during the officers' struggle with the Appellant. Officer Daugherty acknowledged that during a prior hearing on March 4, 2016, he testified that he did not remember what the two males looked like. He also acknowledged testifying at the Appellant's preliminary hearing on August 24, 2014, that he did not need medical attention after struggling with the Appellant. He stated at trial that he received "minor" injuries and that he hit the Appellant's face with his fist five to seven times.

Officer Daugherty acknowledged that the Appellant claimed to have swallowed cocaine and that doing so was dangerous. However, the Appellant did not exhibit any symptoms of having ingested cocaine, such as nausea or vomiting. Officer Daugherty did not find a cellular telephone, beeper, or anything needed to make crack cocaine on the Appellant's person.

Officer H. Cockman testified that in June 2014, he was "assigned to the north Main task force, which is a crime suppression unit." On June 13, he and Officer Daugherty were working downtown in a high-crime area and were there "to be visible" in order to deter crime. They were riding bicycles and wearing yellow shirts with "police" across the back. Officer Cockman said that he saw three males, one of whom turned out to be the Appellant, on the southwest corner of Fourth and Vance and that they were "engaged in a hand-to-hand drug transaction." He stated that he saw "a hand-to-hand movement" and that one of the males "pass[ed]" money to the Appellant.

Officer Cockman testified that he and Officer Daugherty "started over there and went to basically detain all three of them." He said that the officers began a "pat-down for weapons, asking them who they were" and that the Appellant drew Officer Cockman's attention because the Appellant was talking "funny" and had slurred speech. Officer Cockman noticed a cellophane bag in the Appellant's mouth; a white substance was in the bag. He asked the Appellant, who was sitting down, what was in the Appellant's mouth and "went to put [his] hand on" the Appellant. The Appellant kicked Officer Cockman and tried to pull "baggies" out of his mouth and tear them. Officer Cockman said, "I could physically see he was eating the baggies, attempting to, you know. I don't know how much cocaine he did eat, but he was eating what was in those

- 4 -

bags." Officer Cockman said he hit the Appellant to "stop his aggression toward us" and to "stop him from destroying evidence." The officers took the Appellant into custody and put him into a patrol car. Officer Cockman said he and Officer Daugherty called an ambulance for the Appellant because "I have seen people eat crack cocaine and just stroke out."

Officer Cockman testified that the Appellant hit him multiple times during the altercation but that Officer Cockman did not seek medical attention. The two males who were with the Appellant left during the struggle, and Officer Cockman never obtained their names. He said that he did not see anything about the Appellant that caused him to think the Appellant was a drug user but that he was "ninety-nine percent [sure]" the two males were users. The Appellant had money, but not drug paraphernalia, on his person, and his girlfriend's car was parked nearby. A K-9 "check[ed]" the vehicle, but the dog did not indicate drugs were present.

On cross-examination, Officer Cockman testified that he was armed with a Glock firearm, pepper spray, and a baton on June 13. He said that he saw one of the males hand money to the Appellant and acknowledged that he did not see the Appellant actually hand drugs to the male. He said, though, that "as many times as I have dealt with that, yes, and due to the area, it was a drug transaction." He acknowledged that he detained the Appellant and the two males based upon his seeing a hand-to-hand drug transaction and that he conducted a "quick" pat-down of one of the males. He also acknowledged that if he had felt contraband or drugs during the pat-down, he would have removed the object and examined it. He did not find any drugs or contraband during the pat-down in this case but explained as follows:

> There's a difference between a safety pat-down and an "I'm looking for narcotics [pat-down]," especially when it comes to crack cocaine, because you can hide it anywhere. A lot of times, they tear the lining of their jacket, and it will fall inside of the lining of their jacket. A little, bitty five-, ten- to twenty-dollar rock is extremely small. So, on initial pat-downs, you might not find that. You might not find their shooter, which could be in their shoe, or in the lining of their jacket, or their push rod, or their Chore Boy on an initial pat-down.

Officer Cockman testified that while he was struggling with the Appellant, the Appellant "was tearing into the bag. Put it back up to his mouth. Tear into the bag. Put it up to his mouth. Tear [into the bag]." Officer Cockman hit the Appellant's face. He said that he did not know how many times he hit the Appellant but that he hit him "[a]s

many times as it took to place him in custody." Officer Cockman said he did not know the Appellant and did not have any recollection of having seen the Appellant prior to June 13, 2014.

Officer Clinton Langham of the MPD testified that he responded to the scene after the Appellant had been arrested and that he transported the Appellant to the hospital because "[t]hey told me he swallowed dope." En route, Officer Langham did not ask the Appellant any questions, but the Appellant "talked a lot." The Appellant told Officer Langham that he "swallowed most of it," that he had plenty of money, and that he had "just bought his girl two Infinities." On cross-examination, Officer Langham testified that the Appellant did not exhibit any symptoms of having swallowed cocaine.

Officer Darrell Cherry of the MPD testified that he arrived at the scene and "tagged" crack cocaine and $237 in cash. The cocaine was wet, and Officer Cherry took the evidence to the police department. Robert Paige, the property room attendant for the MPD, testified that he received the evidence from Officer Cherry. Paige weighed the crack cocaine, and the cocaine and the plastic baggie it was in weighed a total of 2.1 grams. The $237 was in the following denominations: nine twenty-dollar-bills, four ten-dollar-bills, one five-dollar-bill, and twelve one-dollar bills.

Peter Hall, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in forensic drug analysis that he received evidence related to this case. The evidence consisted of one plastic bag containing a rock-like substance. According to Hall's notes, the bag was "torn in half.'" The weight of the rock-like substance without any packaging was 1.25 grams, and the substance tested positive for cocaine base.

The parties stipulated that St. Patrick School, a private school, and Unique Downtown Learning, a daycare, were operating on June 13, 2014. William D. Merritt, an investigator with the Shelby County District Attorney's Office, testified that he used a rolling tape measure to determine the distance from the location of the Appellant's arrest to the two facilities. The distance to St. Patrick School was 450 feet, and the distance to Unique Downtown Learning was 934 feet.

Ruben Ramirez of the Shelby County Sheriff's Office testified that he was an investigator assigned to inmate telephone monitoring. At the State's request, he obtained recorded jailhouse telephone calls made to and from the Appellant between June 13, 2014, and July 1, 2014. Ramirez obtained seventy calls, and the State played three of them for the jury. In the first call, which was recorded at 11:14 p.m. on June 13, 2014, the day of the Appellant's arrest, the Appellant told an unidentified female that he got "caught with some dope" and that "B.B." needed "to come get the car keys" so B.B.

could get the car. The Appellant also stated that "they took half my money" but that he kept "three hundred." In the second call, which was recorded on June 14, 2014, the Appellant talked with another unidentified female, whom he repeatedly called "Baby." During their conversation, he referred to "dope" and told her, "All the customers come to me." He also told her that he "had the [sh**] in [his] hand" and that he "had to put the [sh**]" in [his] mouth." She asked if "they got some dope off you," and he told her, "Yeah, they got two grams." In the third call, which was recorded at 7:35 p.m. on June 29, 2014, an unidentified female told the Appellant that she "sold two shirts" and that "it was keeping [her] going." The Appellant, who repeatedly called her "Baby," told her that "they know for sure I'm selling dope." He also told her that he was not going to keep any "dope" in the car and that, from now on, he was going to "keep it in [his a**]."

Detective Ian James of the MPD testified as an expert in narcotics that he worked for eleven years as a narcotics officer and that he spent two of those years working undercover. He explained that drug users snorted powder cocaine but smoked or injected crack cocaine and that he expected to find a crack pipe on a user but not a seller. Cocaine often was referred to as "white girl, T-shirts, [and] China white" on the street. A seller usually started with a one-ounce rock of crack cocaine and then broke the rock into smaller pieces to sell to users. Detective James said the seller could store crack rocks in baggies and then hide the baggies in his or her mouth or anus to conceal them from the police. Addicts who bought the crack rocks did not care where the baggies came from. Detective James said sellers often parked their cars within walking distance and stood in a location where users could find them. The usual transaction on the street was two-tenths of a gram for ten to twenty dollars. Detective James said that he had never had any prior dealings with the Appellant but that, in his opinion, the Appellant was "definitely" selling crack cocaine on June 13, 2014.

On cross-examination, Detective James testified that he personally had engaged in hundreds of hand-to-hand drug transactions while working undercover in Memphis but that he had not done so since 2012. He said that some users smoked crack cocaine by mixing it with marijuana and that a user did not need a crack pipe to smoke the mixture, also known as "primo." He noted that a user probably would not resist arrest and stated that drug dealers, knowing he was a police officer, had bragged to him about selling drugs and making money. He stated that after reviewing the evidence in this case, he concluded that the Appellant possessed "a dealer amount" of crack cocaine. At the conclusion of Detective James' testimony, the State rested its case.

Thirty-seven-year-old Norvil Moore testified that he owned a tire shop in Memphis and that he had known the Appellant most of Moore's life. He stated that he and the Appellant used to spend a lot of time together and that in 2012, "we was in this same Courtroom for a prior case that me and him was -- I was stealing. Couple more

- 7 -

guys, doing drugs, sitting in the same seat, a couple of years ago." He said he and the Appellant used to steal "stuff out of stores," such as clothes and cigarettes, and then use the money from selling the items to get "high." In June 2014, the Appellant worked for Moore at Moore's tire shop. The Appellant worked about three days per week, and Moore paid him daily in cash. Moore said that on a "good" day, the Appellant would earn $75 to $150.

Moore testified that he had seen the Appellant use marijuana, cocaine, and crack cocaine previously and that the Appellant's drug of choice when he was with Moore was crack cocaine or "primo." Moore described primo as "crack cocaine and a cigarette" or "crack cocaine and weed" inside two rolling papers. Moore went to jail in July 2011, and the Appellant went to jail in 2012. Moore got out of jail prior to the Appellant and stopped using drugs. However, the Appellant continued using drugs, so Moore "stopped dealing with him." Moore last saw the Appellant use drugs in March or April 2014. He said that the Appellant "has broke the law in a lot of different ways" but that he had never known the Appellant to sell drugs. He said he had never heard crack cocaine referred to as a "shirt."

On cross-examination, Moore testified that the Appellant did not work a regular schedule at the tire shop in June 2014. Moore acknowledged that he was on probation for theft in Mississippi and that he had been convicted of several crimes, including robbery in September 2012. The State asked if the Appellant also went to jail for that robbery, and Moore said no. He then stated, "But we was co-defendants in different other cases because they -- it was seven of us, and they had all us together because all [of] us had committed these types of crimes." Moore acknowledged that he was not with the Appellant on June 13, 2014. On redirect examination, Moore testified that he had never known the Appellant to sell drugs and that he knew the Appellant to be a thief, not a drug dealer.

The thirty-three-year-old Appellant testified that he was schizophrenic and bipolar, that he took three medications for his mental illness, and that he left school after the seventh grade because he could not read. He received a disability check for $720 and $189 in food stamps every month, and he stole and sold Polo shirts and worked at Norvil Moore's tire shop when he needed money. His girlfriends also gave him money. The Appellant did not have a bank account and kept his money in his pocket.

The Appellant testified that he had a drug problem and that he used his money to buy drugs. His drug of choice was crack cocaine, but he also used powder cocaine. The Appellant began using powder cocaine when he was sixteen years old and crack cocaine when he was twenty-one. He said he had never sought treatment for his drug addiction.

The Appellant testified that in June 2014, he was living in an apartment with his girlfriend, Shamika "B.B." Ball. Ball drove an Infiniti, and she let the Appellant drive it when he needed it. The Appellant was dating two other girls while he was living with Ball. He said that he was using crack cocaine three to four times per day and that he bought it in North Memphis and at Fourth and Vance. His preferred method of smoking the crack cocaine was to make primo by combining "dope and weed" and to "roll it up." He said he would "go stealing" when he did not have the money to buy cocaine and acknowledged that he had prior arrests for theft, robbery, aggravated assault, and burglary. He said he committed the crimes in order to get money for drugs.

The Appellant testified that he had seen Officers Daugherty and Cockman "[a] lot" prior to June 13, 2014, but that they had never arrested him. They cited him one time, though, for driving on a suspended license. He said that when he would encounter the officers, they would pat him down and "ask what I got on me." On June 13, the Appellant went to the area of Fourth and Vance to sell "T-shirts." He drove his car, which also was an Infiniti, and parked it nearby. The Appellant bought "[a] little over a gram" of crack cocaine from a drug dealer for sixty dollars, and the cocaine was in one plastic bag. The dealer also wanted a Polo shirt, so the Appellant gave him one. After the drug buy, the Appellant walked to a store. He had the crack cocaine in his hand and about $400 in his pocket.

The Appellant testified that he bought chips and a drink at the store and then walked across the street. At that point, his "partner," who was named "Staley," called his name. The Appellant said that he and Staley talked at the bus stop and that "some other dude" he did not know also was present. While the Appellant and Staley were talking, Officers Daugherty and Cockman approached. The Appellant saw them and put the crack cocaine in his mouth. The officers asked, "'What you doing, Mr. Armstrong?'" The Appellant answered, "'I ain't doing nothing. I'm just over here hollering at my partner.'" He said that Officer Daugherty searched him, that Officer Cockman asked what he had in his mouth, and that Officer Cockman told him, "'Give it to me.'" The Appellant said that before he could give the crack cocaine to Officer Cockman, Officer Cockman grabbed him and hit him. He said that the officers began "constantly just hitting me" and that one of them hit his head with a blackjack while the other hit him with a fist. Defense counsel asked if he tried to chew up the crack cocaine, and he said no. He also said that he did not swallow any crack cocaine and that "I think I would have died." The Appellant spit out the crack cocaine and fell onto the ground, and the officers "stomped" him. The officers handcuffed the Appellant and put him into a patrol car, and Officer Langham took him to the hospital. The Appellant denied telling Officer Langham that he swallowed most of the cocaine. He said he did not allow the officers to search his car because stolen t-shirts were in the car.

- 9 -

The Appellant testified that he did not receive treatment at the hospital because he was too scared to get out of the patrol car due to "what they done to me." The Appellant had a swollen eye, a "busted" lip, two knots on his head, and a blood clot in his eye and received antibiotics in jail. He said that after he was booked into jail, he telephoned his sister and Ball. Neither of them knew the Appellant smoked crack cocaine. The Appellant admitted to Ball on the telephone that he smoked crack, and she broke up with him. The Appellant said that he did not sell drugs to Staley and that Staley did not hand money to him on June 13, 2014. He also said that he did not sell or deliver crack cocaine, that he was not engaged in a hand-to-hand drug transaction, and that he did not chew up the cocaine or swallow it.

On cross-examination, the Appellant denied that "T-shirts" was a reference to drugs. He said that when he talked about selling "shirts" in the recorded calls, he was referring to the shirts he had stolen. The Appellant said that in the first recorded call the State played for the jury, he was talking with his sister and told her to telephone his girlfriend. He acknowledged that during his conversation with his sister, he never told her that the police injured him. He also acknowledged that he refused treatment at the hospital. The Appellant admitted being convicted of two robberies in 2012, aggravated burglary and theft in 2010, theft in 2008, aggravated assault in 2006, theft in 2004, theft in 2003, and multiple thefts in 2001.

The Appellant acknowledged that he lied to his girlfriend, his family, his friends, and the police but denied that he was an untruthful person. He also denied telling Officer Daugherty that he sold drugs and denied telling Officer Langham that he swallowed most of the cocaine. He said both officers were lying. He maintained that he used cocaine, not sold it, and that he had been a user for a long time. The Appellant denied that he was trying to convince the jury that he was a drug user in order to serve less time in confinement. At that point, the State played a fourth recorded jailhouse telephone call for the jury. The Appellant said he did not remember saying during the June 15 call, "'Don't worry about it. . . . I'm just going to tell them I use it.'"

On redirect examination, the Appellant acknowledged that the punishment for selling drugs was greater than the punishment for using drugs. He also acknowledged that during the recorded calls, he talked about "dope" and "shirts" and that he had no reason to use the words interchangeably.

At the conclusion of the proof, the jury convicted the Appellant as charged. After a sentencing hearing, the trial court sentenced him as a Range II offender to forty years for counts one and two, possession of cocaine within 1,000 feet of a private school, and twenty years for counts three and four, possession of cocaine within 1,000 feet of a daycare. The court merged the four convictions. The trial court sentenced the Appellant

- 10 -

as a Range II, multiple offender to ten years for count five, tampering with evidence, and six months for count six, resisting arrest. The court ordered that the Appellant serve the ten-year and six-month sentences consecutively to the effective forty-year sentence for a total effective sentence of fifty and one-half years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his convictions of possessing cocaine and destroying evidence. Regarding the convictions of possessing cocaine, he claims that the proof shows he possessed the cocaine but does not show he did so with intent to sell or deliver. Regarding the conviction of destroying evidence, he claims that the proof "overwhelmingly supports attempt." The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v.

Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to . . . deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). Possession of cocaine "is a Class B felony if the amount involved is point five (.5) grams or more." Tenn. Code Ann. § 39-17-417(c)(1). However, when a defendant possesses cocaine with intent to sell 0.5 grams or more "on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school [or] child care agency, . . . [the defendant] shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b)(1).

As charged in this case, "[i]t is unlawful for any person, knowing that an investigation . . . is . . . in progress, to . . . destroy . . . [a] thing with intent to impair its . . . availability as evidence in the investigation." Tenn. Code Ann. § 39-16-503(a)(1). "Destroy" means "to ruin or put out of existence." State v. Logan, 973 S.W.2d 279, (Tenn. Crim. App. 1998).

Taken in the light most favorable to the State, the evidence shows that on June 13, 2014, Officers Daugherty and Cockman saw the Appellant and two unidentified males standing on a corner in downtown Memphis. The officers saw the Appellant receive money from one of the males and hand him a controlled substance. The officers approached and began patting down the two males. While talking with the Appellant, the officers noticed that he had baggies of crack cocaine in his mouth. They told the Appellant to spit out the cocaine, and he began struggling with them and chewing up the baggies. The officers hit the Appellant repeatedly in order to subdue him and stop him from destroying the evidence. The Appellant told the officers that he "had swallowed," spit out the baggies, and stopped struggling. When the officers retrieved the baggies, one was open and empty except for cocaine residue, and the other contained crack cocaine. En route to the hospital, the Appellant told an officer that he swallowed "most of it."

Although the Appellant contends that the evidence fails to show he possessed the cocaine with intent to sell or deliver, the jury chose to accredit the officers' testimony that they saw the Appellant conduct a hand-to-hand drug transaction with one of the males. Moreover, the officers found $237 dollars, but no drug paraphernalia, on the Appellant's person. An expert in narcotics testified that drug sellers often hid cocaine in their mouths and that he would expect to find drug paraphernalia on a drug user but not a drug seller. He also opined that, based on the facts of this case, the Appellant was selling cocaine on June 13, 2014. The evidence is sufficient to support the Appellant's convictions of possessing cocaine with intent to sell or deliver.

- 12 -

Regarding the Appellant's conviction of destroying evidence, the Appellant told the officers during the struggle and told Officer Langham during the drive to the hospital that he had swallowed cocaine. Officer Daugherty testified that one of the baggies he retrieved was torn and contained only cocaine residue and that he was concerned the Appellant had swallowed cocaine. Therefore, the evidence also is sufficient to support the Appellant's conviction of destroying evidence.

## B. Motion to Suppress

The Appellant contends that the trial court erred by denying his pretrial motion to suppress the evidence found by the officers and any statements he made to them because they stopped him without reasonable suspicion that a crime was in progress. The State argues that the trial court properly denied the motion. We agree with the State.

At the suppression hearing, Officer Daugherty testified that on June 13, 2014, he and Officer Cockman were patrolling on bicycles and that they saw the Appellant "standing on the south side of Vance, just west of Fourth Street, on the sidewalk." Officer Daugherty said that the area was "known for high crime, whether it be violent crime, and drug sales" and that he had "run into Ray Armstrong numerous times, usually about once a week, in that area." The State asked if the Appellant had made statements to Officer Daugherty previously about what the Appellant did for a living, and Officer Daugherty answered, "Yes, ma'am. He made statements about selling narcotics. He said he sells them, but we would not catch him."

Officer Daugherty testified that it was daylight, that he was about forty yards from the Appellant, and that two males were standing on the sidewalk with the Appellant. Officer Daugherty said that one of the males "was handing [the Appellant] money, while [the Appellant] was handing [the male] something else." Officers Daugherty and Cockman "approached them, asked them what they were doing" and "[p]hysically detained them, started patting them down for weapons." While Officer Daugherty was talking with the Appellant, he saw several plastic baggies containing crack cocaine in the Appellant's mouth. He told the Appellant to spit out the baggies "at which time [the Appellant] started chewing and swallowing them and then began kicking at us in an attempt to get away." Meanwhile, the two other males left the scene. Officer Daugherty said that the Appellant continued chewing and kicking for one to two minutes and that "[h]e did eventually advise that he . . . had swallowed all the narcotics and that he didn't have anything." Officer Daugherty said that he found two plastic baggies and that "[o]ne of them was torn, just had residue cocaine, and the other had crack cocaine in it." He also found "[t]wo hundred forty-something dollars" on the Appellant's person.

On cross-examination, defense counsel asked if Officer Daugherty had arrested the Appellant prior to June 13, and he said that he had either issued a citation to the Appellant or arrested him for driving on a suspended license. However, Officer Daugherty had never found the Appellant to be in possession of drugs or weapons and had never cited or arrested him for any drug-related offenses. He said that when he approached the Appellant and the two males, he would have said, "'Hey Ray. What you doing?'" However, he would not have told the Appellant that the Appellant was under arrest. He patted down one of the two males while Officer Cockman patted down the other, and the officers did not find any weapons or drugs on either of them. While the officers were patting down the two males, the Appellant was across from the officers, and Officer Daugherty was talking to the Appellant. At that time, Officer Daugherty was within two feet of the Appellant and saw two clear plastic baggies containing crack cocaine in his mouth. Officer Daugherty said that when he "went to recover that," the Appellant "started fighting." He said he saw the Appellant swallow what was in one of the baggies and then spit out the baggie. Officer Daugherty later put both of the baggies into an envelope and gave them to another officer "to tag."

Officer Daugherty testified that the Appellant had told him on "[m]ultiple occasions" that the Appellant sold drugs but that the officers would never catch him. He said that he took the Appellant's statements seriously and acknowledged that he would "check" the Appellant every time he suspected the Appellant of committing a crime. He said that although he never found drugs on the Appellant prior to June 13, "[w]e've arrested individuals with narcotics around him."

On the morning of trial, the trial court orally denied the Appellant's motion to suppress. First, the court summarized the facts presented at the hearing. The court then summarized its conclusions as follows:

> There are reasonable ground for suspicion, based on this officer's observation, and, when they approached the Defendant, this officer testified that he actually saw cocaine, or what he believed to be cocaine, in Mr. Armstrong's mouth.

> So, this Court does find that there is more than enough reason -- probable cause for this warrantless arrest that was conducted of Mr. Armstrong, and for those reasons, the Court will, in fact, deny the motion to suppress that was filed in this case.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and

resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against "unreasonable searches and seizures." In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009). However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed. State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). Our courts have thus articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted).

An "officer may approach an individual in a public place and ask questions without implicating constitutional protections" even when there is no basis for suspecting criminal activity. State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000). "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" Id. at 424 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In other words, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." Id. at 425. In determining when an encounter becomes a seizure, a court should consider all of the circumstances pertaining to the encounter. Id. Some relevant factors are as follows:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

- 15 -

Id. at 426.

"Reasonable suspicion" for a detention is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

A full-scale arrest

> is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted). "Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Turning to the instant case, Officers Daugherty and Cockman saw the Appellant participate in what looked like a hand-to-hand drug transaction, approached the Appellant and the two males, and asked what they were doing. Daugherty said he and Officer Cockman "physically detained" the three men and "started patting them down for weapons." The fact that the officers began frisking the two males confirms that the Appellant and the two males had been seized. See State v. Williamson, 368 S.W.3d 468, 476 (Tenn. 2012) (providing that a frisk results in a seizure).

- 16 -

Because there was a seizure, the officers were required to have reasonable suspicion to justify the investigatory stop. Terry, 392 U.S. at 20-21 (approving an officer's investigatory stop of a defendant if it is based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed). Daugherty testified that Fourth and Vance was a high-crime area and that he had made numerous drug arrests in the area. He stated that he saw one of the males hand money to the Appellant and that he saw the Appellant hand "something" to the male. Daugherty could not identify the item. However, the Appellant had told him on multiple occasions that the Appellant sold drugs, and Officer Daugherty had arrested people "around" the Appellant for drugs. Thus, we conclude that under the totality of the circumstances in this case, the officer had reasonable suspicion to conduct a brief investigatory stop of the Appellant. During that stop, Officer Daugherty saw baggies containing what appeared to be crack cocaine in the Appellant's mouth. At that point, the officer had probable cause to arrest the Appellant. Therefore, we conclude that the trial court properly denied the Appellant's motion to suppress.

## C. Appellant's Prior Bad Acts

Next, the Appellant claims that the trial court erred by allowing Officer Cockman to testify about "what he was told by some street-people informants" because the testimony was hearsay and violated Tennessee Rule of Evidence 404(b). The State argues that the trial court correctly determined that Officer Cockman's testimony was not hearsay and that his testimony was admissible under Rule 404(b) to show the Appellant's intent to sell and deliver cocaine. We conclude that the testimony was inadmissible but that the trial court's error in admitting the testimony was harmless.

During Officer Cockman's testimony, the State asked if he knew the Appellant prior to July 13, 2014. Officer Cockman said that he did not personally know the Appellant but that "I keep informants. They're people who like to help out under the table. Just like to talk to you about what's going on in the area." Defense counsel asked to approach the bench and objected on the basis that the officer "may be about to testify to some sort of hearsay." The State responded, "It's not being offered for the truth of the matter asserted, but for the affect that it had on this officer and his partner."

During a jury-out hearing, Officer Cockman testified that he had had "personal conversation[s] with informants" and that most of them were "indigent, homeless" and would give him information in exchange for money. The following exchange then occurred:

> [THE STATE]: Are you saying that you received [drug] information regarding this Defendant?

THE WITNESS: As far as the possible sales of Mr. Armstrong in that area? Yes.

[THE STATE]: Can you go into more detail and tell the Judge while we are here, how many people or informants have you heard that from?

THE WITNESS: Two in that area. Two.

[THE STATE]: Okay. And this is yourself, personally, or from other people?

THE WITNESS: This is myself, personal - personally, having these conversations with them.

[THE STATE]: Is this working in that same area downtown?

THE WITNESS: Yes.

. . . .

[THE STATE]: Now, when you were given that information at that time, did you launch any investigations?

THE WITNESS: No. No. It's just basically, okay, I was rattled off a few names to me, "Hey, you might want to be on the lookout for this guy. You might want to be on the lookout for this guy. If you come across him, he's probably holding, because he sells in this area."

[THE STATE]: Okay. And is that information that you took into consideration when the two of you were on patrol, looking to see what was going on?

THE WITNESS: [On] that day, strictly for Ray Armstrong, no. But, in that area, if you are in that area, there is a high probability you are, one, a user, or a seller.

- 18 -

(Emphasis added.)  Defense counsel did not question Officer Cockman but renewed her objection, stating, "It's not only hearsay, it's highly prejudicial hearsay."

The trial court ruled that Officer's Cockman's testimony was not hearsay because the statements were being offered to show why Officer Cockman was "concentrating the investigation in this area" and why he approached the Appellant after seeing the hand-to-hand exchange, not for the truth of the matter asserted.  The court then stated as follows:

> The Court does find that, if I were doing a 404(b) analysis -- and, again, I don't think it is necessary.  The Court finds that the statements are relevant to a material issue, other than conduct conforming with a character trait which is, in fact, inadmissible.  The Court does not find that, based on the testimony, that it has been proven by clear and convincing evidence, and the Court also finds that the probative value is not substantially outweighed by the danger of unfair prejudice.

> One of the things that the State has to prove is that these drugs, if Mr. Armstrong possessed drugs, were, in fact, possessed with intent to sell or deliver, and the argument, the theory of the case, has been that Mr. Armstrong is simply a drug user, and that he is not a seller.

> And for all those reasons, the Court finds that these statements are, in fact, admissible for those purposes as stated.  And will note the exception for the record.

When Officer Cockman's testimony in front of the jury resumed, the State asked if he personally had received information from people on the street about the Appellant.  Officer Cockman said two crack cocaine users had advised him that "Ray Armstrong" occasionally sold drugs in the area.  However, Officer Cockman "had no earthly idea" who they were talking about because he did not know what Ray Armstrong looked like.  Officer Cockman then testified about June 13, 2014, and stated, "I saw [the Appellant], but did not know it was Mr. Armstrong at the time."  At the conclusion of Officer Cockman's direct testimony, the trial court instructed the jury that the statements by the two cocaine users were not being offered for their truth and that

> you cannot consider those statements as proof that Mr. Armstrong was, in fact, selling drugs, but only to show the effect that it had on this witness, and why they were, in fact,

- 19 -

conducting an investigation in that particular area, and to show, if you find that Mr. Armstrong possessed any drugs, that he possessed it as one of the elements the State has to prove, that he possessed it with intent to sell or deliver those drugs.

On cross-examination, Officer Cockman testified that he "did not know [the Appellant's] face" until June 13, 2014. Defense counsel asked, "Well, then, I guess I'm wondering how, when you saw Mr. Armstrong from diagonally across the street, did you even know that this was the person the informants had told you about?" Officer Cockman answered,

No. No, I didn't, and at no time did I say that I -- "Oh, that's Ray Armstrong. . . . Let me rush over there and snatch him up." The way that I found out that it was Ray Armstrong is the narcotics was in his mouth, and we identified him. I did not know at the time that that was Ray Armstrong. I just knew that that was a subject that just made a, in my mind, a narcotics transaction.

At the conclusion of Officer Cockman's testimony, defense counsel moved to strike his "hearsay statements about the informants, because it came out on cross that the statements were not, in fact, the reason that he approached and detained Mr. Armstrong." The trial court refused, stating that it had already given the jury a lengthy instruction that the statements were not being offered for their truth.

First, we will address the Appellant's claim that Officer Cockman's testimony was hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. A trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id.

The trial court first determined that Officer Cockman's testimony was not hearsay because it was being offered to show why Officer Cockman was working near Fourth and Vance on June 13. However, Officer Cockman never testified that he was patrolling the area because informants had told him Ray Armstrong was selling drugs there. Instead, he

- 20 -

testified that he and Officer Daugherty were there "basically, just to what we call troll that area, just to be visible" in order to deter crime. Moreover, during the jury-out hearing, the State asked Officer Cockman if he took the informants' information into consideration when he was on patrol that day, and he answered, "[On] that day, strictly for Ray Armstrong, no." The trial court also ruled that the statements were not hearsay because they were being offered to show why Officer Cockman approached the Appellant. However, when Officer Cockman's direct examination testimony resumed in front of the jury, he stated that he did not know "Ray Armstrong" or what Ray Armstrong looked like on June 13. Therefore, the testimony also was not admissible to show why Officer Cockman approached the Appellant.

Next, we will address the Appellant's claim that the trial court improperly concluded that Officer Cockman's testimony was admissible under Tennessee Rule of Evidence 404(b). Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court held a hearing outside the jury's presence and determined that Officer Cockman's testimony about the informants' statements was admissible to show the Appellant's intent to sell and deliver drugs on June 13. However, the court then found that the prior bad acts had not been proven by clear and convincing evidence. The trial court's finding was logical, given that the State was arguing that Officer Cockman's testimony about the informants' statements was not being offered for its truth. The trial court also found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The correct standard, though, was the lower standard of whether the probative value of the evidence was outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court erred by finding Officer Cockman's testimony admissible under Rule 404(b).

The State argues that even if the trial court erred by admitting Officer Cockman's testimony, the error was harmless. In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [was] correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." Id. Furthermore, "[t]he harmful effects of propensity evidence that undermines a defendant's credibility increase in close cases when the outcome depends on the jury's assessment of the witnesses' credibility" making errors in admitting evidence "less likely to be harmless in close cases." Id. at 377.

The Appellant never disputed that he possessed the crack cocaine. Instead, his defense was that he was a drug user, that he possessed the crack cocaine for personal use, and that the officers were lying about seeing him engaged in a hand-to-hand drug transaction. However, both officers gave consistent testimony about seeing the Appellant receive money from one of the two males and hand something to the male. Although the officers did not find any crack cocaine on the two males when they conducted pat-downs, Officer Cockman explained that an officer might not feel a small crack rock during a pat-

- 22 -

down for weapons. The officers saw baggies containing crack cocaine in the Appellant's mouth and found $237, but no drug paraphernalia, on the Appellant's person. An expert in narcotics testified that the Appellant possessed "a dealer amount" of crack cocaine and that, in his opinion, the Appellant was "definitely" selling drugs on June 13. Accordingly, the evidence against the Appellant was strong.

Moreover, Officer Cockman's improper testimony about the informants' telling him that the Appellant sold drugs in the area was not the only evidence presented that the Appellant was a drug dealer. In telephone conversations with his girlfriend, the Appellant told her that "all the customers come to me" and that that the police "know for sure I'm selling dope." Officer Daugherty testified on direct examination, without any objection from the Appellant, that the Appellant had told him previously that the Appellant "sells drugs but that the police would never catch him." Furthermore, the Appellant elicited during Officer Daugherty's cross-examination testimony that Officer Daugherty had seen the Appellant make what appeared to be hand-to-hand transactions with other individuals previously and that the officer had arrested "individuals on the scene in possession of drugs." In our view, such proof greatly reduces the harm from Officer Cockman's improper testimony. Accordingly, we agree with the State that the trial court's error was harmless.

### D. Attempt as Lesser-Included Offense

The Appellant contends that the trial court erred by refusing to instruct the jury on criminal attempt as a lesser-included offense of destroying evidence. The State argues that the Appellant has waived this issue and that any error does not rise to the level of plain error. We agree with the State that the Appellant has waived the issue.

On the first day of trial, the Appellant filed a motion pursuant to Tennessee Code Annotated secion 40-18-110(a), requesting that the trial court instruct the jury on numerous lesser-included offenses, including criminal attempt as a lesser-included offense of destroying evidence. During the trial, defense counsel again requested the instruction, stating, "Will you consider charging attempted tampering with evidence? Because it's indicted as destroying. So, there was an attempt." The trial court refused, finding that an attempt instruction was not supported by the proof because "Mr. Armstrong says he did not tamper with evidence, did not try to destroy evidence, was not trying to do anything at all, and he just got beaten because he could not, basically, get the dope out of his mouth quickly enough." The trial court did not instruct the jury on any lesser-included offenses of destroying evidence.

In the Appellant's motion for new trial, he contended that "[t]he trial court erred in denying the defense's Motion for Instruction on Lesser Included Offenses. In particular,

the trial court erred by denying the defense's request for an instruction on Casual Exchange [as a lesser-included offense of possession of cocaine with intent to sell or deliver]." The motion did not mention the court's denying the request for an instruction on attempt as a lesser-included offense of destroying evidence, and the Appellant did not raise the issue at the hearing on the motion. Therefore, the trial court did not address the issue when it denied the motion. The State argues that the Appellant has waived the issue because he failed to include it in his motion for new trial.

Rule 3(e), Tennessee Rules of Appellate Procedure, expressly cautions that

> no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

In other words, the failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review. Accordingly, we agree with the State that the appellant has waived this issue.

The State asks that we review the issue under the plain error doctrine, which provides, "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). However, the Appellant has not requested or made any argument with regard to plain error. Therefore, we decline the State's request to consider the issue under plain error.

### E. Comment on Missing Witness

The Appellant contends that the trial court erred by allowing the prosecutor to comment on Staley's absence at trial, which violated the missing witness rule. The State argues that the prosecutor's comment was not improper because the prosecutor made the comment in response to the Appellant's argument. We agree with the State.

During the Appellant's closing argument, defense counsel stated as follows:

> Now, [Officers Daugherty and Cockman] approached
> the people. Asked their names. They don't remember the

names of these people. They patted them down and searched them, but did not find any contraband. Now, [the prosecutor] says, "Wouldn't it have just been easier for them to say that they saw Mr. Armstrong give these people drugs?" No, it wouldn't have been easier, because then they would have had to explain why they did not find any drugs or any contraband on these people at all.

Now, ladies and gentlemen, these are witnesses. There are witnesses who could have gotten up on that stand and said, one way or another, whether Mr. Armstrong was serving them or not, but they're not here. They're not available. We can't ask them those questions.

Ladies and gentlemen, I want you to ask yourselves again, did these officers really see what they claimed to see? Did this happen at all?

During the State's rebuttal argument, the prosecutor argued as follows:

Whose fault is it that the other two aren't here today? Because Officer Daugherty and Officer Cockman, when they pulled up to stop what was a transaction that had just been completed, what they saw and what they did was not let two go. They pulled up and stopped all three. They stopped all three. And they told you that they patted down the other two, and the other two weren't running away. The other two were right there. They had not searched them yet. They had not done a detailed enough search to find a crack rock. They had not talked to them yet, and they didn't get to because he fought back.

. . . .

Think about what else you heard him tell you. He told you that he and his partner had been there together, and his partner -- look back at your notes, whether it's Stanley or Staley, or whatever he said his name is, that was there with him to see it all. Where is he? Whose fault is it that he's not here?

- 25 -

At that point, defense counsel asked to approach the bench, and the trial court stated, "No ma'am. This is invited argument, [defense counsel]. You argued why did the State not have these folks here." The court immediately instructed the jury that the Appellant was not required to present any proof or witnesses but that if defense counsel was going to argue that the State should have presented a witness, then the State had a right to respond to counsel's argument.

Generally, the missing witness rule allows a party to argue and have the jury instructed "that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions." State v. Middlebrooks, 840 S.W.2d 317, 334 (Tenn. 1992). Before a party may invoke the missing witness rule, the record must demonstrate that (1) the witness had knowledge of material facts; (2) a relationship existed between the witness and the opposing party that would naturally incline the witness to favor that party; and (3) the missing witness was available to the process of the court for trial. State v. Francis, 669 S.W.2d 85, 88 (Tenn.1984); Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979).

Here, nothing indicates that Staley was available to the process of the court for trial. In any event, we do not think the prosecutor was commenting on the Appellant's failure to present Staley as a witness. The Appellant argued to the jury that the State should have called the two males as witnesses because they could have testified "one way or another" whether the Appellant sold them crack cocaine. During the prosecutor's rebuttal argument, she responded by telling the jury that the two men were able to leave the scene before the officers could obtain their identification or search them thoroughly and that their ability to leave was due to the Appellant's fighting with the officers. In other words, she was explaining that it was the Appellant's fault the State could not present Staley as a witness at trial. Therefore, we conclude that the prosecutor's comments were a response to the Appellant's argument and did not implicate the missing witness rule.

## F. Double Jeopardy

Finally, the Appellant contends that his four convictions and sentences for possessing cocaine with intent to sell and deliver violate double jeopardy because they resulted from a single incident. Specifically, he argues that count one is identical to count three and that count two is identical to count four, except for the named drug-free school zones. He further argues that because the drug-free school zone is merely a "sentence enhancement," this court should dismiss counts one and two or counts three and four. We conclude that the Appellant is not entitled to relief.

Initially, we note that the Appellant acknowledges he did not raise this issue in his motion for new trial and that he requests we review it for plain error. An issue for which a new trial is sought may be waived if a defendant fails to raise it in a motion for a new trial. See Tenn. R.App. P. 3(e). The remedy for a double jeopardy violation, though, is not a new trial but a dismissal of a charge or merger of convictions. See, e.g., State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). Therefore, we will address the issue on its merits.

"The State may prosecute a defendant on alternative theories of a crime, and if the jury convicts the defendant under both theories, the 'merger and imposition of a single judgment of conviction protects against double jeopardy[.]'" Victor Clark v. State, No. W2015-00186-CCA-R3-PC, 2016 WL 1250985, at *5 (Tenn. Crim. App. at Jackson, Mar. 30, 2016) (quoting State v. Torrez Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *29 (Tenn. Crim. App. at Jackson, Oct. 16, 2006)). In the instant case, the grand jury indicted the Appellant based on four alternative theories of the crime: (1) possessing cocaine with intent to sell within 1,000 feet of St. Patrick School, (2) possessing cocaine with intent to deliver within 1,000 feet of St. Patrick School, (3) possessing cocaine with intent to sell within 1,000 feet of Unique Downtown Learning, and (4) possessing cocaine with intent to deliver within 1,000 feet of Unique Downtown Learning. However, "the legislature did not intend to allow for multiple units of prosecution under 39-17-432 for a single sale of cocaine [pursuant] to 39-17-417 that occurred in overlapping drug-free zones." State v. Tracy Dale Tate, No. E2014-01191-CCA-R3-CD, 2015 WL 2400718, at *7 (Tenn. Crim. App. at Knoxville, May 20, 2015), perm. app. denied, (Tenn. Aug. 12, 2015). Thus, the Appellant's convictions in counts three and four violate double jeopardy.

A remedy for such improper dual convictions is merger. See id. The trial court merged all four of the convictions in this case. Therefore, the Appellant is not entitled to relief.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 27 -